830 F.2d 193
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Elizabeth GARDINER, Administratrix of the Estate of John H.
Gardiner, deceased, (Nos. 86-1198/1243) Fannie Mae Treu,
Executrix of the Estate of Donald Treu (Nos. 86-1198/1260),
Plaintiffs-Appellees, Cross-Appellants,
v.
UNITED STATES of America, Defendant-Appellant, Cross-Appellee.
 Nos. 86-1198, 86-1199, 86-1243 and 86-1260
 United States Court of Appeals, Sixth Circuit.
 September 30, 1987.
 
 Before NATHANIEL R. JONES, WELLFORD, and RALPH B. GUY Jr., Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant United States appeals from the judgment finding it liable in connection with an air crash occurring at the Flint, Michigan Bishop Airport on January 6, 1977. Plaintiffs Elizabeth Gardiner and Fannie Mae Treu, suing on behalf of their deceased husbands, who were pilots of the plane involved, cross appeal from the district court's finding that the two pilots in the aircraft at the time were also equally at fault. Because we are unable to determine from the district court's decision the factual basis for its conclusion that the government was partially at fault, we remand for prompt clarification. We reverse the district court's decision as to the date for fixing interest against the United States in the event an award is finally determined against it. If the district court determines and satisfactorily sets out a factual and legal basis for liability determination against the United States, we affirm its finding that each of the pilots were fifty percent liable, (based on their respective comparative negligence) and therefore reducing the ultimate award by one-half as to each plaintiff.
 
 I.
 
 2
 On January 6, 1977 a Learjet Model 23 aircraft with registration No. N332PC ('L2PC') crashed at 7:12 p.m., Eastern Standard Time. The crash occurred in Flint, Michigan, approximately one-half mile from runway 27 of Flint Bishop Airport. The only people on board the airplane were killed, pilots Donald Treu and John Gardiner.
 
 
 3
 Because of low visibility that day, the pilots could rely only on their instruments in making the flight. Treu and Gardiner planned to fly the L2PC from Willow Run Airport, past Detroit and on to Flint where they intended to land before continuing on to Chicago. When the L2PC entered the airspace of the air traffic control tower in Flint, it became the duty of the air traffic controller to line up the aircraft with an imaginary path through the air which would align the airplane properly with the runway. This imaginary path is called a 'localizer course.'
 
 
 4
 Three and a half miles from the end of each runway is a transmitter which signals to passing aircraft the correct path they need to take in order to correctly approach the runway. This transmitter is called a marker beacon. Both parties agree that FAA regulations require air traffic controllers to line aircraft up with the runway at least three and a half miles from the marker beacon (or seven miles from the runway). One of the purposes behind this regulation is to allow pilots of the aircraft sufficient time to maneuver for landing.
 
 
 5
 Liability in this action turns on whether the air traffic controller's actions were a proximate cause of the crash by directing the pilots to maneuver for a landing too close to the airport in violation of FAA regulations. Neither side challenges the fact that L2PC and two other planes which landed ahead of it were advised by the air traffic controller that they were within three miles of the marker beacon and instructed each of them to turn toward the airport for a landing in sequence. Plaintiffs contended that the Learjet in question was too close to the landing area to be considered safe by FAA regulations when so instructed and that this negligent action was the basis of liability against the United States. The government contended at trial and continues to argue on appeal that the crash was in fact caused solely by the pilots' negligence and that the giving of an incorrect position report was not a cause of the crash. Specifically, the defendant claims that the pilots flew the airplane too slowly while attempting to land, that the pilots should have recognized that an erroneous position report had been given, and that the mistaken position given by the air traffic controller was not a proximate cause of the tragic accident.
 
 
 6
 The plaintiffs' theory was that the controller caused the pilots of the jet to try to align it for landing when it was actually located then too close to the runway. In short, plaintiffs assert that the evidence demonstrated that the airplane was within the seven mile zone when it was instructed to turn to manuever for a landing and that this was a cause of the crash; the government, on the other hand, asserts that the Learjet was actually beyond the seven mile zone when directed to turn. We note that at oral argument plaintiffs have virtually conceded that the pilots were partially at fault in respect to the crash.
 
 II.
 
 7
 In its memorandum opinion, the district court clearly found that pilot error constituted negligence contributing to the crash: 'The pilots' negligence contributing to the crash includes flying the plane at too slow an approach speed, 122 knots rather than the proper speed of 132 knots and in not determining a timely fashion to make a missed approach.' The district court also pointed to an incorrect altimeter setting, caused by pilot negligence, as a contributing factor in the accident. The court went on to find both of the pilots equally responsible and negligent in these respects.
 
 
 8
 Our primary difficulty in the opinion below lies with the district court's treatment of the evidence concerning the fault of the air traffic controller, and the basis for finding any such fault a proximate cause of the crash. The opinion states, 'the Court is compelled to conclude the wrong position report by the Flint air traffic control was a cause of the ultimate crash. . ..' This statement may lend itself to the theories of both sides and compels us to remand the decision for clarification and/or further specific factfinding, which would set out the precise nature and effect of the 'wrong position report' of the air traffic controller.
 
 
 9
 Both sides agree that the air traffic controller, Frank Walters, told L2PC that it was three miles from the beacon marker and that, if true, that distance violates FAA regulations. The government contends that there was merely a mistaken position report and that other compelling facts and circumstances indicate that the Learjet was actually further away from the beacon marker and had sufficient distance to effect a safe landing.[1] The plaintiffs base their case on the contention that the position report was, in fact, correct and not 'wrong' as to actual location of the jet, but that the air traffic controller was at fault in directing the landing when the aircraft was too close to the airport to maneuver safely for landing. Plaintiffs may prevail, based on the district court's other findings, if the jet in fact were determined to be less than seven miles from Flint Bishop Airport when it was told to turn and maneuver for the landing. If it were determined that L2PC was given only an incorrect statement of its actual position, then the question of causation must then be dealt with by the district court. We reach this decision also in light of the district court's conclusion that a pilot has an obligation to request a new set of instructions from the control tower when it becomes apparent that the commands given 'would require an unsafe operation of the aircraft.' In any event, we cannot decide the question of government liability without further specific findings.
 
 
 10
 We accordingly remand the decision for the district court's prompt clarification. We effect a remand with some misgivings because of the already lengthy delay in resolving this controversy.
 
 III.
 
 11
 We conclude that the trial court properly disposed of the other issues raised in this appeal save one. In its amended judgment filed August 7, 1986, the district court attached interest to its award against the United States to commence as of the last day of trial, April 24, 1984. The court's stated purpose in awarding this interest was to offset the diminished state of plaintiffs' award resulting from various post-trial delays.
 
 
 12
 Awarding interest in this manner, however, violates 31 U.S.C. Sec. 1304(b)(1)(A), which states that the United States will pay interest on a judgment only when the award is affirmed on appeal, and then only from the date when notification of the district court's judgment is filed with the Comptroller General. This notification occurred on October 31, 1984.[2]
 
 
 13
 Because the award of interest violates the clear language of Sec. 1304, we reverse the action and direct that interest be awarded in accordance with the statute, if and when a final determination of liability is established.
 
 
 14
 We REMAND for further proceedings consistent with this opinion.
 
 
 
 [1]
 One basis of the government's assertion is that the two planes ahead of the Learjet were given similar position reports and had adequate distance for a safe landing
 
 
 [2]
 The government does not dispute that notification occurred as of this date, but claims that the notice was ineffective because judgment was not yet final. We reject this argument because both parties considered August 31, 1984, the date the district court's damages order was entered, to be a final judgment for purposes of appeal. We see no reason to designate a different date under Sec. 1304